# United States Court of Appeals
### For the Eighth Circuit

_____

No. 18-1455

_____

United States of America for the use of Wesco Distribution, Inc.

*Plaintiff*

v.

Liberty Mutual Insurance Company

*Defendant - Appellee*

International Fidelity Insurance Company

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: December 11, 2018
Filed: April 12, 2019

_____

Before LOKEN, MELLOY, and ERICKSON, Circuit Judges.

_____

LOKEN, Circuit Judge.

This appeal is part of a complex dispute over costs that resulted from contractor defaults in completing a federal government construction project. After partial

summary judgment rulings and a bench trial, the district court[1] entered judgment against a subcontractor's surety, International Fidelity Insurance Co. ("Fidelity"), and in favor of the general contractor's surety, Liberty Mutual Insurance Co. ("Liberty"), for the full amount of Fidelity's performance bond. Fidelity appeals. We affirm.

## I. Background.

In March 2012, Greenleaf Construction Co. ("Greenleaf") entered into a Prime Contract with the United States to build an Army Reserve Center in Des Moines, Iowa. As required by the Miller Act, 40 U.S.C. § 3131(b), Greenleaf obtained a performance bond and a payment bond from Liberty naming Greenleaf as principal and the United States as obligee. "A performance bond protects the owner, or obligee, ensuring project completion if the general contractor defaults. A payment bond ensures that laborers and material suppliers will be paid if the general contractor defaults." Pa. Nat'l Mut. Cas. Ins. Co. v. City of Pine Bluff, 354 F.3d 945, 949 n.2 (8th Cir. 2004) (citations omitted). In April, Greenleaf entered into a Subcontract in which International Electric, Inc. ("Electric"), agreed to perform defined electrical and communications work on the project for $1,020,000. The Subcontract required Electric to furnish performance and payment bonds in the amounts of $1,020,000 (the bonds' "penal sum"). Electric obtained the bonds from Fidelity, naming Electric as principal and Greenleaf as obligee. The performance bond obligated Fidelity to "promptly remedy" a default by Electric on the Subcontract or "arrange for the performance of [Electric's] obligation under the subcontract."

In January 2014, Greenleaf, Liberty, and the United States entered into a Takeover Agreement in which Greenleaf and the government "agreed to an immediate consensual termination and default" of the Prime Contract. Liberty agreed

---

[1]The Honorable Rebecca Goodgame Ebinger, United States District Judge for the Southern District of Iowa.

to "complete the Contract in accordance with its terms" and "reaffirm[ed] the validity of [Liberty's] Bonds to secure the obligations of its completion." The Takeover Agreement provided that Liberty "becomes entitled to all rights, titles, and interests of Greenleaf in and to the [Prime] Contract." The government agreed to accept Vertex Companies, LLC ("Vertex"), as Liberty's "completion contractor." The government also agreed to work with Liberty "to agree on a schedule establishing a new construction completion date," which had been October 12, 2013.

On February 7, Liberty and Electric entered into a Subcontract Ratification Agreement in which Liberty agreed to pay Electric $244,134 for work previously performed under the Subcontract but not paid by Greenleaf. Electric agreed to "perform the balance of the work for [the unpaid balance of the $1,020,000 Subcontract amount, $347,612] in accordance with the terms and conditions of the Subcontract, as modified by this Agreement." Fidelity was not asked to -- and did not -- bond the Ratification Agreement.

A dispute soon arose between Electric and Vertex as completing general contractor, and Electric never returned to the project. Liberty terminated Electric for its default in April 2014 and notified Fidelity. Fidelity refused to complete Electric's obligations under the Subcontract. Liberty hired an electrical subcontractor, ABC Electric, to complete work under the Subcontract. ABC Electric concluded that much of the work Electric had performed needed to be redone and ultimately charged Liberty $1,657,745 to complete electrical and communications work on the project.

This lawsuit began in August 2014 when the federal government sued Greenleaf, Electric, Liberty, and Fidelity on behalf of an unpaid supplier. That claim has been resolved. Liberty filed a cross-claim against Fidelity and Electric for breach

of the Subcontract and breach of Fidelity's performance and payment bonds.[2]  Ruling on cross-motions for summary judgment, the district court granted Liberty partial summary judgment, ruling that Liberty may assert claims against Fidelity's performance bond, the bond was not discharged by replacement or material alteration, and Fidelity's obligations "were triggered by the satisfaction of the bond's conditions precedent."  After a bench trial on Liberty's claims against the performance and payment bonds, the court entered judgment against Fidelity for $1,020,000, the full amount of its performance bond.  Fidelity has not appealed the $104,231 judgment entered in favor of Liberty on its claims against Fidelity's payment bond.

Fidelity argues it is not liable to Liberty on the performance bond because (1) Liberty was not Greenleaf's "successor" entitled to assert a claim on the bond; (2) the Ratification Agreement discharged Fidelity's performance bond because it was either an entirely new agreement or materially altered Electric's Subcontract, and Fidelity did not bond the Ratification Agreement; and (3) Liberty's claim did not meet conditions precedent to the performance bond's coverage.

## II.  The Successor Issue.

In holding that Liberty may assert a claim against Fidelity's performance bond, the district court first ruled that, by satisfying Greenleaf's obligations under the Prime Contract and the Subcontract, Liberty became subrogated to Greenleaf's rights through equitable subrogation.  The court noted it is well-established "that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed," Pearlman v. Reliance Ins. Co., 371 U.S. 132, 136-37 (1962), and the Supreme Court of Iowa expansively views the rights of a subrogee who "steps into the shoes" of another, Iowa Dep't of Human Servs. v. Unisys Corp.,

---

[2]Electric subsequently filed for bankruptcy protection.  The bankruptcy court lifted the automatic stay to permit Liberty's claim against Fidelity to proceed.

637 N.W.2d 142, 156 (Iowa 2001).  Without challenging this general principle, Fidelity argues that Liberty as subrogee acquired no right to assert a claim against the performance bond because the bond provides, "No right of action shall accrue on this bond to or for the use of any . . . corporation other than [Greenleaf] or the heirs, executors, administrators or successors of [Greenleaf]."  Citing corporate law decisions, Fidelity argues that Liberty was not Greenleaf's "successor" under the bond "because it never assumed generally Greenleaf's liabilities."  Like the district court, we disagree.

The Supreme Court of Iowa has stated that "[t]he exact meaning of the word 'successor' as applied to a contract must depend largely on the kind and character of the contract, its purposes and circumstances, and the context."  Sun Valley Iowa Lake Ass'n v. Anderson, 551 N.W.2d 621, 640 (Iowa 1996) (quotation omitted).  Applying this standard in the context of surety bonds, the district court agreed with decisions from other jurisdictions concluding that a surety who has performed the contract obligations of its principal "qualifies as a 'successor.'"  See Argonaut Ins. Co. v. Commercial Std. Ins. Co., 380 So. 2d 1066, 1067-68 (Fla. App. 1980), followed in Menorah Nursing Home, Inc. v. Zukov, 548 N.Y.S.2d 702, 705-06 (App. Div. 1989).

Though Fidelity urges us to adopt a narrower definition of successor that is more in tune with corporate law, we agree with the district court's interpretation of the word as used in Fidelity's performance bond.  Moreover, there is an additional reason to adopt this interpretation.  The performance bond Liberty issued to ensure general contractor Greenleaf's performance to the United States was a bond legally mandated by the Miller Act.  See generally Restatement (Third) of Suretyship & Guaranty § 71 (1996).  Federal Acquisition Regulations expressly encourage government contracting officers to enter into a takeover agreement with a surety such as Liberty who is willing to perform its defaulting principal's obligations as government contractor.  See 48 C.F.R. § 49.404.

When a general contractor's surety takes over completion of a federal government construction project and "steps in the shoes" of its principal, the purposes of the Miller Act and the FAR regulations to protect the government are served if the surety is subrogated to the principal's contract rights vis-a-vis a subcontractor such as Electric and, if the subcontractor defaults, its surety. Fidelity, in the business of issuing performance and payment bonds, necessarily understands this reality. Thus, when Fidelity has issued a performance bond for a subcontractor on a federal project, and its principal has defaulted, we reject its contention that the ambiguous word "successor" in the performance bond did not include as obligee a surety operating under a Takeover Agreement with the federal government.

### III. Bond Discharge Issues.

Exalting form over substance and ignoring modern suretyship authorities, Fidelity next argues that its obligations under the performance bond were discharged "because the Ratification Agreement either replaced or materially altered" the Subcontract that Fidelity bonded. Fidelity first argues that "[t]he bonded Subcontract ended -- at the latest -- in January 2014 upon the execution of the Takeover Agreement." Fidelity cites no Subcontract provision or legal authority supporting this contention, instead asserting that "the notion that the Subcontract continued despite Greenleaf leaving the job is nonsensical." Of course, this ignores the legal and contractual consequences of Liberty as surety stepping in the shoes of its principal to complete the Prime Contract. Nothing in Greenleaf's Subcontract with Electric provided that the contract terminates if Greenleaf ceases to be general contractor. Indeed, the Subcontract expressly prohibited Electric, *but not Greenleaf*, from assigning or transferring its interest without consent. In the February 2014 Ratification Agreement, Electric and Liberty expressly "ratif[ied] and confirm[ed] that the Subcontract is in effect, and that [Electric] shall perform and complete the Subcontract in accordance with the terms and provisions thereof at the direction of [Liberty] and for the same consideration." Thus, the Subcontract never "ended."

-6-

Turning to a more difficult issue, Fidelity argues that the Ratification Agreement discharged Fidelity's bond because it was a "material alteration" of the bonded Subcontract. Fidelity first urges us to adopt the "general rule" that *any* contract change discharges the surety, even if to its benefit. See Holland v. Story Cty., 192 N.W. 402, 403 (Iowa 1923). The district court instead adopted the more modern rule that, to be discharged, the surety must show that an alteration enlarged or added to the obligations or otherwise prejudiced the performance of the surety's bonded principal. See Knapp v. Knapp, 99 N.W.2d 396, 402 (Iowa 1959); Throp v. Chaloupka, 208 N.W. 299, 300 (Iowa 1926). The evolution of this rule reflected a recognition that the older strict rule "was problematic when applied to secondary obligors, such as surety companies, who were in the business of entering into secondary obligations" and received a windfall if their obligations were discharged for an alteration that caused no harm. Restatement Suretyship § 37, cmt. a. Agreeing with this trend, the Restatement adopted, for most contract modifications, the rule that a surety "is discharged from any unperformed duties . . . if the modification . . . imposes risks on the [surety] fundamentally different from those imposed . . . prior to modification." § 41(b)(i). The Restatement rule and the rule the district court derived from Knapp are essentially the same. We conclude the Supreme Court of Iowa would apply an equivalent rule governing discharge of a surety in this construction contract situation. Fidelity cites no contrary authority.

Applying this standard to the Ratification Agreement, the district court concluded that none of the alterations alleged by Fidelity "materially altered [Electric's] actual obligations under the Subcontract." We agree. The Ratification Agreement expressly left the Subcontractor's performance obligations, time to complete its work, and compensation unchanged. Fidelity primarily argues that changing the general contractor and bond obligee from Greenleaf to Liberty was material and prejudicial because "the chief financial officers of Electric and Greenleaf were close personal friends" but Electric had no such relationship with Vertex. We reject this argument because it would automatically discharge a subcontractor surety's

performance bond whenever the general contractor's surety operating under a Takeover Agreement becomes a successor bond obligee.

Fidelity further argues that the Ratification Agreement was a material alteration because, as a result of changing the bond obligee, Fidelity "has been ordered to pay hundreds of thousands of dollars to redo work that the named obligee, Greenleaf, previously accepted" to complete a Subcontract that was valued at $347,612 in the Ratification Agreement. But the alleged causation is unfounded. As the district court observed, "these increased costs occurred after the parties signed the Ratification Agreement. The Ratification Agreement did not amend the Subcontract to increase Electric's obligation -- and thus increase the total cost of Electric's work." Moreover, Electric was terminated before it performed additional work under the Ratification Agreement. True, the increased costs to complete performance of the Subcontract were incurred after Electric was terminated. But they resulted from defective work Electric performed before Liberty replaced Greenleaf under the Takeover Agreement. Thus, had there been no Ratification Agreement, Liberty as Greenleaf's successor would have had virtually the same claim against Fidelity's performance bond.

We agree with the district court that the many Subcontract changes in the Ratification Agreement cited by Fidelity did not as a matter of law, singly or in combination, so materially alter Electric's obligations under the Subcontract that Fidelity's performance bond was discharged. This ruling did not foreclose possible defenses to Liberty's claim against the bond based on facts surrounding Liberty's takeover and completion of Electric's performance under the Subcontract as modified by the Ratification Agreement. Cf. Restatement Suretyship § 41(b)(ii). These defenses were thoroughly litigated in the bench trial. For example, in response to Fidelity's contention that Liberty failed to mitigate its damages as successor obligee, the court found that Liberty acted reasonably in replacing Greenleaf with Vertex as completion contractor and took appropriate measures to avoid escalating costs during the transition. Fidelity has not appealed these bench trial findings.

## IV.  Condition Precedent Issues.

The performance bond provided that Fidelity's remedy obligations are triggered "[w]henever [Electric] shall be, and be declared by [Greenleaf] to be in default under the subcontract, [Greenleaf] having performed [Greenleaf's] obligations thereunder . . . ."  Fidelity argues that Liberty's claim against the performance bond must be rejected because it failed to meet these two conditions precedent.

First, Fidelity argues that, at the time Liberty terminated Electric for its default under the Subcontract, "Greenleaf could not have been performing under the Subcontract because Greenleaf defaulted on the Project three months earlier." Second, Fidelity argues that "Greenleaf never declared Electric in default under the Subcontract."  We agree with the district court that these contentions are without merit because they are inconsistent with Liberty's right as successor obligee.  First, Fidelity does not claim that Liberty had failed to perform the obligee's obligations under the Subcontract when the bond claim was made.  At that time, Greenleaf's Subcontract performance was irrelevant.  Second, it is undisputed that Electric was in default when the claim was made (Fidelity as surety later filed a claim in Electric's bankruptcy proceeding).  We reject as frivolous the contention that the notice of default to Electric was ineffective because it was sent by Vertex rather than Liberty.

For the foregoing reasons, the judgment of the district court is affirmed.

_____